**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

DR. KISHORE JAYAKUMAR,

Case No.

Plaintiff,

V.

JENNIFER PENNING,

Defendant.

---

This matter arises out of the same transaction or occurrence as *Kishore Jayakumar v. Michigan Health Clinic, P.C., David Stockman, M.D., Magdelena Perez, and Brian Hart*, Case No. 1:26-cv-11779-SKD-PTM, pending before the Hon. Susan K. DeClercq

## COMPLAINT

Plaintiff, Dr. Kishore Jayakumar, by and through his attorneys, Brooks Wilkins Sharkey & Turco, PLLC, complains against Defendant Jennifer Penning, as follows:

## PARTIES

1. Plaintiff Dr. Kishore Jayakumar ("Plaintiff" or "Dr. Jayakumar") is a citizen and resident of the District of Columbia.

2. Defendant Jennifer Penning ("Defendant" or "Penning") is a resident of New Mexico. During the events giving rise to this action, Defendant resided in Saginaw County, Michigan and, upon information.

**JURISDICTION AND VENUE**

3. Jurisdiction is proper under 28 U.S.C. § 1332 (diversity jurisdiction) because Plaintiff is a citizen of the District of Columbia, Defendant is a citizen of New Mexico, and the amount in controversy exceeds $75,000.

4. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Eastern District of Michigan.

5. This action is related to *Jayakumar v. Michigan Health Clinics, P.C. et al.*, No. 1:26-cv-11779 (E.D. Mich.), which arises from Dr. Jayakumar's employment by Michigan Health Clinics, P.C. ("MHC") and resulting unpaid wages. Penning is not presently a defendant in that action.

**FACTUAL ALLEGATIONS**

6. Dr. Jayakumar is a medical doctor and licensed dermatology physician.

7. Upon information and belief, Penning is a dermatology nurse practitioner who was employed by MHC from 2020 through 2025 and occupied the senior clinical leadership position of Chief Nursing Officer.

**A. Penning assists with recruiting Dr. Jayakumar to be employed by MHC.**

8. In 2023, Dr. Jayakumar was recruited to work for MHC remotely from Washington, D.C., as a dermatologist.

9. Dr. Jayakumar's employment contemplated that he would provide telehealth dermatology services to MHC's patients.

10. Dr. Jayakumar was recruited by several members of MHC, including Penning.

11. Specifically, on or about August 29, 2023, Penning, together with MHC's Chief Administrative Officer Magdalena Perez, conducted an approximately 40-minute telephone interview of Dr. Jayakumar.

12. The phone interview covered, among other subjects, MHC's operations, dermatology practice, growth and expansion, staffing, and patient volume, as well as Dr. Jayakumar's proposed schedule, employee benefits, and compensation.

13. Penning actively participated in recruiting Dr. Jayakumar.

14. During the interview, Dr. Jayakumar stated that he was seeking compensation based on Relative Value Units ("RVUs").

15. An RVU is a nationally published measure of the relative value of a physician service and is commonly used to measure physician productivity and

determine compensation. Different medical services, including different types of office visits and procedures, are assigned different RVU values. A Total RVU consists of three components: the Work RVU, Practice Expense RVU, and Malpractice RVU.

16. The intent of compensation based on the RVU system is that the physician is paid for each specific service provided to patients, i.e. it is essentially a pay-when-paid arrangement.

17. During the compensation discussion, Perez stated that MHC provided RVU-based compensation incentives under employee contracts.

18. Penning further discussed an RVU-based compensation arrangement with Dr. Jayakumar. She stated that she would speak with Dr. Stockman about an appropriate RVU goal and that MHC would develop an appropriate RVU-based compensation structure.

19. Penning's statements reinforced Perez's representation that MHC had a functioning RVU-based compensation system and could implement such an arrangement under which Dr. Jayakumar would be paid according to the physician services he performed and patients he treated.

20. Penning's compensation and patient-volume representations conveyed that MHC was offering Dr. Jayakumar a genuine employment relationship in which

increased physician productivity would generate his compensation and he would be paid for the physician services he performed.

21. During this phone interview, Dr. Jayakumar asked Penning and Perez to provide background information on MHC. He also specifically inquired about MHC's history, organization, and current focus.

**B. Dr. Jayakumar services MHC patients, MHC bills for those services, but fails to pay the RVUs to Dr. Jayakumar.**

22. As a result of the representations made by Penning, including compensation on an RVU system basis, Dr. Jayakumar became employed by MHC on or about November 1, 2023.

23. Dr. Jayakumar's written employment agreement adopted an RVU-based compensation structure. Under the agreement, MHC agreed to pay Dr. Jayakumar $60 per "net RVU," defined as the Total RVU assigned to a medical service minus its Practice Expense RVU.

24. Dr. Jayakumar began performing dermatology services remotely on or about November 29, 2023.

25. From November 2023 through January 2024, Dr. Jayakumar generated 526.45 net RVUs and therefore earned $31,587.00 in gross wages under the employment agreement.

26. From February through June 2024, Dr. Jayakumar generated an additional 1,839.76 net RVUs and therefore earned an additional $110,385.60 in gross wages.

27. In total, Dr. Jayakumar generated 2,366.21 net RVUs and earned $141,972.60 for the physician services he provided to MHC.

28. Upon information and belief, MHC billed patients and third-party payers for Dr. Jayakumar's medical services and received payments arising from those services.

29. Despite receiving the benefit of Dr. Jayakumar's services, MHC substantially failed to pay the corresponding RVU-based compensation it had promised him.

30. Dr. Jayakumar did not receive his first paycheck until February 2024. That paycheck was for only $10,500.00 in gross wages, though he had already earned $31,587.00 for services performed from November 2023 through January 2024.

31. Dr. Jayakumar thereafter received no paychecks that successfully cleared for services performed from February through June 2024. Throughout his employment, he received only $10,500 in gross wages, leaving $131,472.60 in unpaid wages.

32. Dr. Jayakumar also suffered additional economic losses, including unreimbursed health-insurance expenses and lost alternative employment opportunities.

**C. Dr. Jayakumar learns that Penning's statements that led to his employment were false and misleading.**

33. Perez's statements to Dr. Jaykumar during the August 2023 phone interview were knowingly misleading.

34. Specifically, Penning's statements that MHC was an established, expanding multispecialty clinic was false.

35. Penning also failed to correct or qualify Perez's false or misleading statements—she did not disclose MHC's longstanding and recurring failures to pay physicians and other employees who had earned RVUs.

36. Penning never disclosed MHC's recurring payroll problems, or the numerous lawsuits, judgments, and collection actions against it.

37. Penning never disclosed that MHC had recently failed to pay its prior dermatologist, Dr. Nasir, based on the same or a similar RVU compensation system.

38. Penning never disclosed that Dr. Nasir left MHC in early 2023 due to non-payment of compensation. Inapposite, Penning stated that MHC was an expanding dermatology clinic with multiple other professionals and unlimited clients.

39. During the August interview, Penning stated that MHC did not have a Mohs surgeon and that patients requiring Mohs surgery were referred elsewhere.

40. Penning did not disclose that Dr. Nasir—a Mohs surgeon—had left MHC only months earlier, due to nonpayment of compensation under an RVU system.

41. Penning also knew that MHC's nonpayment of Dr. Nasir's wages was a substantial reason for his departure.

42. Even before Dr. Jayakumar's August 29, 2023, phone interview, numerous lawsuits had been filed by MHC's former physicians and vendors against MHC or its owner, Dr. David Stockman. These lawsuits alleged unpaid wages, breach of contract, fraud, False Claims Act violations, and other claims. In multiple cases, judgments had already been entered against MHC or Stockman.

43. MHC's financial and payroll issues were sufficiently serious that, during approximately July through September 2023, MHC's leadership was alleged to have been engaging in a check-kiting scheme to fund payroll and employee benefits.

44. These issues occurred prior to and during the same period in which Penning represented to Dr. Jayakumar that MHC was a growing business and routinely engaged physicians who would be paid based on the RVU compensation arrangement.

45. Penning was familiar with MHC's physicians, clinical operations, staffing, and the dermatology service line.

46. Based on her knowledge of MHC's recurring payroll problems and its recent failure to pay Dr. Nasir, Penning knew that there was a substantial risk that Dr. Jayakumar would not be paid fully and timely for the physician services MHC was recruiting him to perform.

47. Based on her knowledge of MHC's recurring payroll problems and its recent failure to pay Dr. Nasir, Penning knew that payments received by MHC for Dr. Jayakumar's services would likely be used to fund historical liabilities, and not to pay Dr. Jayakumar under the RVU compensation system.

48. Even after Dr. Jayakumar began employment and MHC's payroll problems continued, Penning never corrected the materially misleading impression she had created during the recruitment process or warned Dr. Jayakumar of the continuing risk that he would not be paid for his services.

49. The failure to disclose the prior nonpayment of MHC's dermatologist that led to his resignation, the recurring nonpayment of other employees and vendors, and MHC's extensive history of lawsuits, judgments, and collection actions, were material to Dr. Jayakumar's decision whether to accept and begin employment with MHC.

50. As a remote, out-of-state applicant, Dr. Jayakumar had no practical ability to observe MHC's internal operations, financial and payroll practices, employee complaints, and reasons for physician departures.

**COUNT I—FRAUD**

51. Dr. Jayakumar incorporates all the foregoing allegations as if restated fully here.

52. Penning knowingly participated in recruiting Dr. Jayakumar to provide dermatology services to MHC in exchange for promised compensation.

53. Penning participated in discussions concerning the specific RVU-based compensation arrangement that Dr. Jayakumar sought, failed to qualify Perez's compensation representations with material facts that Penning knew concerning MHC's recurring failures to pay physicians and other employees, and represented that MHC would develop an appropriate RVU-based compensation structure for Dr. Jayakumar.

54. Penning's affirmative statements, half-truths, omissions, and reinforcement of Perez's representations created a materially false and misleading impression concerning MHC and the employment relationship.

55. Having undertaken to discuss MHC's dermatology position and proposed RVU-based compensation structure in detail, and to respond to Dr.

Jayakumar's specific inquiries concerning MHC and the position, Penning had a duty to disclose facts necessary to prevent those statements from becoming materially misleading.

56. Penning intentionally or recklessly withheld material information while inducing Dr. Jayakumar to accept employment.

57. Penning did so despite knowing that MHC's recurring payroll failures and its recent nonpayment of Dr. Nasir created a substantial risk that Dr. Jayakumar would not receive the compensation being offered in exchange for his services.

58. Penning intended that Dr. Jayakumar rely upon the information and impression that she conveyed.

59. Dr. Jayakumar reasonably relied upon Penning's representations and omissions in accepting employment. Had Penning made the appropriate disclosures, Dr. Jayakumar never would have accepted the position.

60. As a direct and proximate result of Penning's conduct, Dr. Jayakumar performed substantial medical services for which he was not paid and suffered economic damages exceeding $75,000.

## COUNT II—NEGLIGENT MISREPRESENTATION

### Plead in the alternative

61. Dr. Jayakumar incorporates all the foregoing allegations as if restated fully here.

62. The information Penning supplied and omitted concerning MHC and the proposed employment relationship was material to Dr. Jayakumar's decision whether to accept employment.

63. Penning had a duty to exercise reasonable care in communicating material information concerning subjects she undertook to discuss and to avoid supplying materially misleading partial information.

64. If Penning did not intentionally or recklessly deceive Dr. Jayakumar, she nevertheless failed to exercise reasonable care in supplying accurate information concerning MHC and the proposed employment relationship.

65. At a minimum, based on MHC's recurring payroll failures and its recent nonpayment of Dr. Nasir, Penning knew or should have known that there was a substantial risk that Dr. Jayakumar would not be paid fully and timely for the services MHC was recruiting him to perform.

66. Dr. Jayakumar reasonably relied on the materially incomplete information Penning supplied. Had the information been accurately and completely disclosed, he would not have accepted the position.

67. As a direct and proximate result, Dr. Jayakumar suffered substantial economic loss, including the value of medical services that he was not paid for.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendant Jennifer Penning as follows:

a. Compensatory and consequential damages in an amount to be determined at trial and exceeding $75,000;

b. Punitive or exemplary damages to the extent permitted by applicable law;

c. Prejudgment and post-judgment interest;

d. Attorney's fees and costs;

e. And such other relief as this Court deems just and equitable.

Respectfully submitted,

*<u>/s/ Brad A. Danek</u>*
Brad A. Danek (P72098)
**Brooks Wilkins Sharkey & Turco, PLLC**
401 S. Old Woodward Avenue, Suite 400
Birmingham, MI 48009
Ph: (248) 971-1800 Fax: (248) 971-1801
danek@bwst-law.com
Attorneys for Plaintiff